UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH S.,[1] | Case No. 18-cv-07153-TSH |
| Plaintiff, | |
| v. | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| ANDREW M. SAUL, | Re: Dkt. Nos. 24, 35 |
| Defendant. | |

## I.     INTRODUCTION

Plaintiff Elizabeth S. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Andrew M. Saul, Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 24 (Pl.'s Mot.), 35 (Def.'s Mot.).  Pursuant to Civil Local Rule 16-5, the motions have been submitted without oral argument.  Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion for the following reasons.

## II.     BACKGROUND

### A.     Age, Education and Work Experience

Plaintiff is 57 years old.  AR 211.  She did not graduate from high school but did complete some college courses.  AR 41, 73-74.  She has past relevant work as a Deli Clerk (DOT# 316.684-

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

014) and as a Cashier (DOT # 211.462-010), both light exertion, SVP 2, unskilled jobs.  AR 24, 75, 253.

**B.     Medical Evidence**

**1.     Objective Evidence**

A May 2, 2013 radiology report by Dr. Sandra Mun, M.D., Alameda County Medical Center, reported "mild soft tissue swelling" around Plaintiff's bilateral wrists and proximal interphalangeal ("PIP") joints, no aggressive bony erosions or demineralization, and "questionable minimal osteophyte formation in several proximal and distal interphalangeal [("DIP")] joints suggesting possible early degenerative change."  AR 600.

An August 26, 2014 assessment by Dr. C Michael Neuwelt, M.D., Alameda County Medical Center, noted "bilateral mild soft tissue swelling" of Plaintiff's PIPs, with minimal tenderness to palpation in those joints, and mild tenderness to palpation of her metacarpophalangeal ("MCP") joints and bilateral wrists with some associated soft tissue swelling, but "[o]therwise, no tenderness of her bilateral elbows or shoulders."  AR 435.  Dr. Neuwelt found strength was full in all extremities.  *Id.*  The assessment also noted a full range of motion of Plaintiffs fingers "albeit with some pain after flexion" and "full range to wrist extension with decreased [] range of motion to wrist flexion," and "[n]o obvious effusion or soft tissue swelling."  *Id.*  Based on lab data the assessment concluded, "[t]his is inflammatory polyarthopathy, possibly rheumatoid arthritis as the patient claims this is a rheumatoid flare, however with negative CRP, rheumatoid factor and anti-CCP less suggestive of true rheumatoid arthritis."  *Id.*

After a physical exam by Dr. Matthew Kiefer, M.D., Alameda County Medical Center, on November 11, 2014, he found mild diffuse tenderness at Plaintiff's bilateral hand joints, wrist joints, elbow, shoulder, hip, and knee, without tenderness or effusion.  AR 331.  He found full range of motion at all joints and no localized tenderness.  *Id.*

A December 22, 2014 radiology report by Dr. Farhad Sani, M.D., also Alameda County Medical Center, relative to Plaintiff's left hand, reported "rheumatoid arthritis possible foreign body second digit," no malalignment, normal mineralization, "much joint space narrowing in the

PIP and DIP joints," and "mild degenerative changes" in the DIP and PIP joints.  AR 605.

A December 21, 2015 radiology report by Dr. Sani relative to Plaintiff's left wrist and hand, reported no acute fracture, no malalignment, unchanged moderate degeneration throughout the PIP and DIP joints, and mild degenerative changes in the radiocarpal joint.  AR 517.

In a July 24, 2016 assessment Dr. Sancia Ferguson, M.D., Highland Hospital, found based on imaging and a physical examination "no joint inflammation as well as normal inflammatory markers."  AR 500.  She noted that rheumatoid factor and CCP antibodies had previously been checked and were negative.  *Id.*  She believed that Plaintiff had degenerative joint diseases (osteoarthritis).  On December 8, 2016, Dr. Mun reviewed x-rays, saw and evaluated Plaintiff, and reviewed and agreed with Dr. Ferguson's July 24 assessment.  *Id.*  She discharged Plaintiff with Tylenol, an over-the-counter acetaminophen painkiller.  *Id.*

In an April 17, 2017 assessment, Dr. Ferguson found based on physical examination:

> [Patient] has enlargement of the PIPs consistent with Bouchard nodes.  They are tender to palpation.  There is no evidence of synovitis [(membrane inflammation)] in these joints.  She also has tenderness to palpation in the DIPs.  She has subtle thickening in the MCPs.  Wrists bilaterally are restricted to flexion, but have normal extension.  Left wrist, subtle synovitis thought to be palpable.  Left wrist is tender.  Elbows nontender, nondistended.  Shoulder on the left has some subacromial tenderness, but normal abduction, internal and external rotation.

AR 491.  Dr. Ferguson noted that Plaintiff had had no new labs since 2015, and that imaging of Plaintiff's hands from October 2010 was within normal limits.  *Id.*  She assessed that Plaintiff was "serologically negative with subtle inflammation and overlapping degenerative changes in the PIPs and DIPs."  *Id.*  Differential diagnosis at that time included diagnosis of seronegative rheumatoid arthritis.  AR 491-92.

A May 17, 2017 x-ray report by Dr. Mun indicated "periarticular osteopenia and soft tissue swelling of inflammatory arthritis" in both hands, erosions seen in the left third PIP joint, and "no deviation or frank joint destruction."  AR 489.

A July 18, 2017 EEG/EMG report by Dr. Michael Gibbs, M.D., indicated "right median sensory motor neuropathy at the wrist (carpal tunnel) severe," and "left median sensory motor neuropathy at the wrist (carpal tunnel) moderate."  AR 488.  It indicated "[n]ormal right ulnar

sensory motor and left ulnar sensory nerve conduction study." *Id.*

### 2. Dr. Gaasbeek's Psychiatric Evaluation

On June 13, 2015, Dr. Kyle Van Gaasbeek, PsyD, MDSI Physician Services, completed a comprehensive psychiatric evaluation of Plaintiff. AR 342-45. He diagnosed her with major depressive disorder, moderate, and stimulant use disorder, severe, cocaine in remission. AR 344. His functional assessment was that Plaintiff had an unimpaired ability to perform simple and repetitive tasks, accept instructions from supervisors, and perform work activities on a consistent basis without special attention or additional instruction; a mild impairment in her ability to perform detailed and complex tasks; and a moderately impaired ability to interact with coworkers and the public, maintain regular attendance in the workplace, complete a normal workday without interruptions from a psychotic condition, and deal with the usual stress encountered in the workplace. AR 345. Dr. Gaasbeek's prognosis was that Plaintiff's "problem is treatable. She receives treatment for her depression. There is a good likelihood that she would be able to eventually fully recover, especially if she is able to have some stability . . . ." AR 344-45.

### 3. Dr. McMillan's Internal Medicine Evaluation

In a June 25, 2015 evaluation, Dr. Eugene McMillan, M.D., Bayview Medical Clinic, noted under "Psychiatric History" that Plaintiff stated that she had been given medications but had not regularly used them. AR 349. He noted that she reported a history of hearing voices. *Id.* Physical examination revealed that Plaintiff had 16 kilograms grip strength in her right hand, and 19 in the left. AR 350. Plaintiff had normal DIP, PIP, and MCP joints, and there was no wrist tenderness or shoulder tenderness. *Id.* Plaintiff had normal range of motions in her wrists, elbows, shoulders, hips, knees, and ankles, and full-strength wrist, elbow, shoulder, hip, knee, and ankle flexion and extension. AR 351. Dr. McMillan concluded, among other things, that there was no evidence of inflammatory arthritis on physical examination; that Plaintiff had been poorly compliant with past recommended treatment; and that Plaintiff would have no limitations with gripping and fine manipulation. *Id.*

4

### 4. Dr. Franklin and Childs' Psychological Evaluation

On January 7, 2016, Dr. Lesleigh Franklin, PhD and Dionna Childs, MS, completed a psychological evaluation and report on Plaintiff. AR 455-62. They assessed Plaintiff with marked limitation in ability to understand, remember, and carry out simple or detailed instructions, interact appropriately with members of the public, accept instructions, and respond appropriately to criticism from supervisors; and extreme limitations in ability to maintain attention and concentration over two-hour segments, perform at a consistent pace without an unreasonable number and length of rest periods, get along and work with others, respond appropriately to changes in a routine work setting and deal with normal work stressors, and complete a normal workday and workweek without interruptions from psychologically-based symptoms. AR 462. They reported based on a Wechsler Abbreviated Scale of Intelligence ("WASI") test a composite IQ for Plaintiff of 61, "extremely low." *Id.*

### 5. Dr. Sakhai and LMFT Neumann's Mental Impairment Questionnaire

On March 17, 2017, Dr. Roya Sakhai, PhD and LMFT Emma Neumann completed a Mental Impairment Questionnaire on Plaintiff. AR 471-76. They noted that Plaintiff was receiving psychotherapy with minimal progress, and that Plaintiff was unlikely to improve without more intensive therapy, social and economic resources, and medication compliance. AR 471. They indicated marked or extreme impairments in Plaintiff's understanding and memory, social interaction, adaptation, and activities of daily living; and extreme limitations in all categories of Plaintiff's sustained concentration and persistence. AR 473-75. They indicated that Plaintiff suffered from extreme function limitation. AR 475. As reasons for their assessments, they found that Plaintiff was "barely able to have a conversation, is often in a catatonic state, and is afraid to leave her house." AR 471. They found that Plaintiff was socially isolated, mistrustful and withdrawn, and opined that she was not able to function or perform activities of daily living independently. AR 474. They found she had severe agoraphobia. AR 475.

### 6. Dr. Howard's Medical Source Statement

On May 15, 2017, Dr. Jonathan Howard, PsyD, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on Plaintiff. AR 463-70. Plaintiff reported that

she lived alone, but required assistance with cooking, shopping, cleaning, and lifting heavy items, and that should could not sit, stand, or walk for long periods. AR 463. Plaintiff denied ever having been psychiatrically hospitalized and reported that she was not taking any medications. AR 464. During a mental status exam, Plaintiff responded to questions and tasks, had adequate rapport, and was adequately cooperative and required only mild encouragement. *Id.* Dr. Howard found Plaintiff's thought process appeared logical and coherent and found no signs of psychosis. AR 465. Nevertheless, Dr. Howard assessed Plaintiff with moderate to marked impairment in ability to understand, remember, and carry out instructions. AR 468. He based this assessment on Plaintiff's performance on the mental status exam, Trail Making Tests Parts A & B, a Wechsler Adult Intelligence Scale-IV ("WAIS") test, and a Wechsler Memory Scale-IV test. *Id.* He assessed Plaintiff with marked impairment in ability to interact appropriately with supervision, co-workers, and the public; in her pace, persistence of tasks, and ability to perform activities within a schedule and maintain regular attendance; and to respond to changes in routine work settings. AR 467, 469. He based this assessment on Plaintiff's presentation of moderate to marked anxiety and depression, and her performance on objective testing. AR 469. He reported after the WAIS test a composite IQ score of 59, "extremely low." AR 465. He diagnosed Plaintiff with mood disorder, not otherwise specified ("NOS"), with depressed and reported psychotic features; rule out psychotic disorder, NOS; and a Global Assessment of Functioning ("GAF") score of 54-56[2]. AR 466.

### 7. Dr. Ferguson's Functional Assessment

On August 15, 2017, Dr. Ferguson completed a functional assessment of Plaintiff based on a physical examination. AR 606-10. She diagnosed Plaintiff with osteoarthritis and rheumatoid arthritis. AR 606. She noted significant inflammation in Plaintiff's wrists, hands, and shoulders, and that Plaintiff's wrists were restricted. *Id.* She noted that x-rays demonstrated both

---

[2] A GAF score in that range reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g.. few friends, conflicts with peers or co-workers)."
https://www.webmd.com/mental-health/gaf-scale-facts;
https://www.albany.edu/counseling_center/docs/GAF.pdf (last visited Mar. 22, 2020).

inflammatory and degenerative arthritis in Plaintiff's hands, and evidence of bursitis in her should and hips. AR 608. She opined based on those findings that Plaintiff was able to lift and carry on a frequent or occasional basis less than 10 pounds; stand and walk with normal breaks about two hours during an eight-hour day; and sit with normal breaks about six hours during an eight-hour day. AR 607. She concluded that Plaintiff could occasionally[3] twist, stoop, and climb stairs, but was unable to crouch or climb ladders. AR 608. And she found Plaintiff's ability to reach and push and pull, and her gross and fine manipulation were limited by her impairments. AR 609.

### 8. Dr. Aames' Mental Impairment Questionnaire and Psychotherapy Notes

On August 15, 2017, Dr. Ted Aames, PhD, Trust Clinic, completed a Mental Impairment Questionnaire on Plaintiff. AR 611-615. He diagnosed Plaintiff with major depressive disorder ("MDD") with psychotic features; Other Specified Trauma- and Stressor-Related Disorder—Persistent Complex Bereavement; and Panic Disorder. He indicated an overall marked impairment in Plaintiff's ability to understand, remember, and apply information; interact with others; and adapt and manage herself; and an extreme impairment in her ability to concentrate, persist, or maintain pace. AR 613-614.

### 9. Dr. Khan's Functional Assessment

On September 20, 2017, Dr. Qiratulanne Khan, Trust Clinic, completed a functional assessment of Plaintiff. AR 616-20. She diagnosed Plaintiff with osteoarthritis and rheumatoid arthritis. AR 616. She noted Plaintiff had joint tenderness and swelling in both hands, knees, and wrists. *Id.* She also noted that x-rays demonstrated both inflammatory and degenerative arthritis in Plaintiff's hands, and bursitis in her should and hips. AR 618. She opined based on those findings that Plaintiff was able to lift and carry on a frequent or occasional basis less than 10 pounds; stand and walk with normal breaks about two hours during an eight-hour day; and sit with normal breaks about four hours during an eight-hour day. AR 617.

### 10. Additional Substance Use Evidence

Dr. Neuwelt's August 26, 2014 assessment indicated that Plaintiff had been taking

---

[3] Occasionally was defined in the assessment as "from very little up to one-third of an eight hour day." AR 608.

tramadol, an opioid painkiller, which she had gotten from friends.  AR 434.  Plaintiff reported that she drank a half pint of vodka with a few beers on a nearly daily basis, that she occasionally smoked marijuana, and that she sometimes inhaled illicit substances.  *Id.*

In a September 8, 2014 Psychological Evaluation Dr. Michael Boroff, PsyD, Trust Clinic, indicated that Plaintiff had been self-medicating her physical and emotional pain with alcohol and occasional cocaine use.  AR 321.  He diagnosed Plaintiff with moderate alcohol use disorder and mild cocaine use disorder.  AR 322.

Dr. Franklin's January 1, 2015 psychological evaluation indicated that Plaintiff reported that she drinks when she smokes and uses cocaine sometimes.  She reported that "substances get her motivated to take care of things," and that her cocaine use was daily but "she now uses it 2 times per week at home by herself."  AR 456.  Dr. Franklin noted that records referenced an arrest with cocaine prior to 2015.  *Id.*

A March 10, 2015 Psychiatry Intake form completed by Dr. Serena Wu, MD, LifeLong Medical Care, indicated that records from "Alameda County psych" showed that Plaintiff was actively using cocaine in 2014.  AR 558.

In a May 5, 2015 assessment, Dr. Neuwelt indicated that Plaintiff continued to drink one to two beers a day and use marijuana and was trying to quit cocaine but had used about 1 ½ to 2 weeks prior.  AR 411.

Dr. Gaasbeek noted in his June 13, 2015 psychiatric evaluation that Plaintiff reported using cocaine on and off for a "very long time" but that she had been clean for 10 years, except for one instance of relapse after her partner died.  AR 342-33.  He diagnosed her with stimulant use disorder, severe, cocaine in remission.  AR 344.

In his June 25, 2015 evaluation, Dr. McMillan noted that Plaintiff stated that she drinks alcohol every day and had used cocaine the day before.  AR 349.

Dr. Ferguson indicated in a November 6, 2015 appointment summary that Plaintiff had a history of polysubstance abuse including marijuana and cocaine.  AR 397.

Dr. Aames noted in a February 9, 2017 psychotherapy initial assessment that Plaintiff denied current use of alcohol or drugs but reported that she had in the past used both to self-

medicate. AR 538. She reported last using substances about a year prior. *Id.*

In their March 17, 2017 impairment questionnaire, Dr. Sakhai and LMFT Neumann indicated that Plaintiff was not using alcohol or drugs, and that to the best of their knowledge, she had not abused drugs or alcohol since 2010. AR 476. This was inconsistent with Plaintiff's admissions to other treatment providers.

### III.    SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On February 28, 2015, Plaintiff filed a claim for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), alleging disability beginning on December 1, 2010, due to sleep apnea, major depressive disorder, mood disorder, anxiety disorder, panic disorder, and degenerative arthritis. AR 18, 109-10, 211-21, 242, 272. The agency denied the claims on March 7, 2015 and September 11, 2015, respectively. AR 146-48, 151-56. Plaintiff filed a request for reconsideration on September 11, 2015 which was denied on December 2, 2015. AR 157-61. On February 1, 2016, Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). AR 18, 165-70. ALJ Arthur Zeidman conducted a hearing on September 19, 2017. AR 18. Plaintiff testified in person at the hearing and was represented by a non-attorney representative, Anne Su. *Id.* Victoria Rei, an impartial vocational expert, also testified. *Id.*; AR 98. The ALJ issued an unfavorable decision on November 24, 2017, finding Plaintiff not disabled under sections 216(i) and 223(d) or section 1614(a)(3)(A) of the SSA. AR 15-32.

### A.    Plaintiff's Testimony

Plaintiff was asked at her hearing what prevents her from working. She testified that grief and depression keep her from working, and that she is scared to leave her house because she is afraid people come in when she is not there or when is asleep. AR 77. She testified that on August 25, 2017, the Oakland Police Department shot through the windows of her apartment, mistaking her unit for someone else's. AR 78.

She testified that she takes medication for pain, and that her "ankles go out periodically" and that she cannot go for long walks. AR 78. She testified that taking medication sometimes doesn't help. AR 78. She testified that she visited a doctor "once or twice" when her ankles

swelled up and it was difficult to walk. AR 79. She testified that her last drink of alcohol was "give or take" 2015. AR 81.

Plaintiff testified that she had an in-home care provider that came somewhere between 45 hours a month and 20 hours a week, but she couldn't recall exactly how much. AR 84-85. The care provider helped her cook, clean, and sometimes get dressed when her hands prevented her from doing so. AR 85. The care provider also took her to get medicine from the pharmacy. AR 79. Plaintiff testified that she had a care provider for over a year. AR 85.

Plaintiff testified that she had been prescribed wrist guards, and that she thought an arthritis clinic had prescribed them. AR 90. She testified that the wrist guards didn't entirely help with her pain, and that she sometimes had difficulty with opening things like cans, doors, and bottles with twist tops. *Id.* Sometimes her care provider helped her with doing so. *Id.*

Concerning her psychological health, Plaintiff testified that she often hears things that other people do not hear, including people calling her name. AR 91. She testified that she sees visions, things that other people do not see. AR 91-92. She was asked whether she thought that people were living in her attic and responded that she does, and that she thinks they come down from the attic when she's not home. AR 92. She was also asked whether she thinks someone is moving around objects in her home and responded that she does. AR 92. She testified that she sees Dr. Aames for her mental health and had seen other multiple other therapists or doctors in the past. AR 93.

**B.  Vocational Expert's Testimony**

Rei testified that in her opinion, a hypothetical individual with Plaintiff's age, education, and past jobs, and same residual functional capacity as determined by the ALJ, if limited to less than the full range of light work, would not be able to do past work as a deli clerk and cashier. AR 101.

**C.  ALJ's Decision and Plaintiff's Appeal**

On November 24, 2017, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. AR 15-32. This decision became final when the Appeals Council declined to review it on October 3, 2018. AR 1-6. Having exhausted all administrative remedies, Plaintiff commenced

this action for judicial review pursuant to 42 U.S.C. § 405(g). On July 11, 2019, Plaintiff filed the present Motion for Summary Judgment. On December 17, 2019, Defendant filed a Cross-Motion for Summary Judgment.

## IV. STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). An ALJ's decision to deny benefits must be set aside only when it is "based on legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and quotation marks omitted). It requires "more than a mere scintilla" but "less than a preponderance" of the evidence. *Id.*; *Trevizo*, 871 F.3d at 674.

The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Trevizo*, 871 F.3d at 675 (citation and quotation marks omitted). However, "[w]here evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Id.* (citation and quotation marks omitted). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation and quotation marks omitted).

## V. DISCUSSION

### A. The ALJ's Determination of Whether Plaintiff Was Disabled

A claimant is considered "disabled" under the SSA if two requirements are met. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity [("SGA")] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that the

1    claimant is unable to perform previous work and cannot, based on age, education, and work

2    experience "engage in any other kind of [SGA] which exists in the national economy." *Id.* §

3    423(d)(2)(A).

4            The regulations promulgated by the Commissioner of Social Security provide for a five-

5    step sequential analysis to determine whether a Social Security claimant is disabled. 20 C.F.R. §

6    404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or

7    negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer*

8    *v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential

9    inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r*

10   *Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the

11   Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v.*

12   *Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

13           The ALJ must first determine whether the claimant is performing SGA, which would

14   mandate that the claimant be found not disabled regardless of medical condition, age, education,

15   and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined Plaintiff had

16   not performed SGA since December 1, 2010. AR 21.

17           At step two, the ALJ must determine, based on medical findings, whether the claimant has

18   a "severe" impairment or combination of impairments as defined by the SSA. 20 C.F.R. §

19   404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. §

20   404.1520(c). Here, the ALJ determined Plaintiff had the following severe impairments: substance

21   use disorder; rheumatoid arthritis, versus osteoarthritis; carpal tunnel syndrome; affective

22   disorders; anxiety disorders; and cognitive disorder. AR 21.

23           If the ALJ determines that the claimant has a severe impairment, the process proceeds to

24   the third step, where the ALJ must determine whether the claimant has an impairment or

25   combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt.

26   P, App. 1 (the "Listings"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either

27   meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis,

28   she is conclusively presumed to be disabled, without considering age, education and work

12

experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met the Listings. AR 21. In particular, the ALJ found that the severity of Plaintiff's physical impairments did not singly or combined meet or medically equal the criteria of any disorder listed in 14.09, *inflammatory Arthritis*. And the ALJ found that Plaintiff's mental impairments, including her substance use disorders, did not singly or in combination, meet or medically equal the criterial of any disorder listed in 12.00, *mental disorders*. If the ALJ determines that a claimant's impairment does not meet a listing, the analysis proceeds to the fourth step.

Before getting to step four, however, the ALJ must determine the claimant's Residual Function Capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). The ALJ assesses the claimant's physical and mental abilities, as well as other abilities affected by the claimant's impairments. *Id.* §§ 404.1545(b)-(d), 416.945(b)-(d). In doing so, the ALJ must consider all the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). With respect to a claimant's physical abilities, "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id.* §§ 404.1545(b), 416.945(b). With respect to a claimant's mental abilities, "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [the claimant's] ability to do past work and other work." *Id.* §§ 404.1545(c), 416.945(c).

Here, the ALJ determined that with her substance abuse disorder, Plaintiff had the RFC to perform light work as defined by 20 C.F.R. § 404.1567(b) & § 416.967(b), except that she could lift or carry 20 pounds occasionally and 10 pounds frequently. AR 23. The ALF found that Plaintiff could sit for six hours, stand or walk for six hours; was limited to hearing and

understanding simple oral instructions; could never work at unprotected heights and never operate motor vehicles; was limited to simple, routine tasks and had judgment limited to simple-work related decisions; could occasionally respond appropriately to supervisors, coworkers, and the general public; could deal with changes in her work setting limited to simple work-related decisions; and would have two absences per month. AR 23.

The fourth step of the evaluation process then requires the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was SGA, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4) (iv). Here, the ALJ determined, based on the vocational expert's testimony, that Plaintiff could not perform past relevant work as a Deli Clerk or Cashier. AR 24.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).[4] Here, the ALJ determined that there were no jobs in the national economy which Plaintiff could perform, and therefore that Plaintiff was disabled. AR 25.

If, however, there is a determination that the claimant is disabled and there is medical evidence showing drug addiction and alcoholism ("DAA"), then the ALJ must determine whether the DAA is "material" to the finding that the claimant is disabled. 20 C.F.R. § 404.1535(a). Under the SSA a claimant "shall not be considered disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the . . . determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). In determining whether a claimant's DAA is material, the

---

[4] The Medical-Vocational Guidelines are commonly known as "the grids". *Lounsbury*, 468 F.3d at 1114.

key question is whether the individual would still be found disabled if she stopped using drugs or alcohol. *See* 20 C.F.R. §§ 404.1535(b), 416.935(b). The ALJ must "evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [she] stopped using drugs or alcohol and then determine whether any or all of [her] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). "If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability. If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied." *Parra v. Astrue*, 481 F.3d 742, 747 (9th Cir. 2007) (citing 20 C.F.R. §§ 404.1535(b)(2)(ii)); 416.935(b)(2)(ii). The claimant bears the burden of proving that her substance use is not a material contributing factor to his disability. *Parra*, 481 F.3d at 745.

The ALJ determined that if Plaintiff stopped substance use, she would continue to have a severe impairment or combination of impairments, but that she still would not have an impairment or combination of impairments that meets or medically equals any of the impairments in the Listings. AR 25-27. The ALJ found that if the she stopped substance use, she would have the RFC to perform light work as defined by 20 §§ 404.1567(b) and 416.967(b), except be able to lift or carry 20 pounds occasionally and 10 pounds frequently; push and pull as much as she could carry; be able to sit, stand, or walk for six hours during an eight-hour workday; and be limited to simple, routine tasks. AR 27-32. The ALJ thus found that Plaintiff would be able to perform past relevant work as a Deli Clerk or Cashier, i.e., that that work would not require the performance of work-related activities beyond Plaintiff's RFC. AR 32. Accordingly, the ALJ concluded that Plaintiff's DAA was a contributing factor material to the finding of disability because she would not be disabled if she stopped the substance use; and because it was, Plaintiff had not been disabled with the meaning of the SAA at any time from the alleged onset date, through the date of the decision, November 24, 2017. AR 32.

**B.    Plaintiff's Arguments**

Plaintiff argues that the ALJ erred in concluding that she did not meet listing 14.09, *inflammatory arthritis*, because he did not explain why she did not meet listing 14.09A. Pl.'s Mot.

for Summ J. 7, ECF No. 24. She argues that she does. Regarding her mental impairments, Plaintiff argues that the ALJ also erred in evaluating whether she met mental impairment listings 12.03, *schizophrenia spectrum and other psychotic disorders*, 12.04, *depressive, bipolar and related disorders*, 12.05, *intellectual disorder*, and 12.06, *anxiety and obsessive-compulsive disorders*. Regarding listings 12.03, 12.04, and 12.06, she argues the ALJ erred in finding she had only moderate or mild limitations in the four areas of mental functioning under paragraph B of listings and thus could not meet the criteria of that paragraph. *Id.* at 12-15. She argues also that the ALJ erred in proceeding to a materiality determination and that the ALJ's determination that DAA was material was not supported by substantial evidence. *Id.* at 10-12. Lastly, she argues that the ALJ should have consulted the Medical-Vocational Guidelines to determine if she was disabled with an RFC of light, and that he erred by failing to do so. *Id.* at 16.

## C. Legal Standards

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *King v. Berryhill*, 2018 WL 4586726, at *11 (N.D. Cal. Sept. 25, 2018). In deciding how much weight to give to any medical opinion, the ALJ considers the extent to which the medical source presents relevant evidence to support the opinion. 20 C.F.R. § 416.927(c)(3). Generally, more weight will be given to an opinion that is supported by medical signs and laboratory findings, and the degree to which the opinion provides supporting explanations and is consistent with the record as a whole. 20 C.F.R. § 416.927(c)(3)-(4). The better an explanation a source provides for a medical opinion, the more weight will be given. 20 C.F.R. § 416.927(c)(3).

The Ninth Circuit has "developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating

physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). If a claimant has a treatment relationship with a provider, and clinical evidence supports that provider's opinion and is consistent with the record, the provider will be given controlling weight. 20 C.F.R. § 416.927(c)(2). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).[5]

**D.     Analysis**

    **1.     The ALJ's Evaluation of Listing 14.09**

       Plaintiff challenges the ALJ's finding that she did not have "inflammation or deformity of . . . one major peripheral joint in each upper extremity resulting in the inability to perform fine and gross movements effectively," and thus did not meet listing 14.09, *inflammatory arthritis*. AR 21-22. "Listing-level severity in 14.09A . . . is shown by an impairment that results in an 'extreme' (very serious) limitation." Listings § 14.00(D)(6)(e)(i). "The section is met with persistent inflammation or deformity of [1] one major peripheral weight-bearing joint resulting in the inability to ambulate effectively (as defined in 14.00C6); or [2] one major peripheral joint in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7)." *Id.* The inability to perform fine and gross movements "effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* §§ 14.00(C)(7), 1.00(B)(2)(c). The ALJ concluded that Plaintiff suffers from rheumatoid arthritis and carpal tunnel syndrome, and that these impairments were severe, but he found these impairments did not meet either criteria in 14.09A. AR 21-22.

       In making her argument, Plaintiff points out first that in Dr. Ferguson's August 15, 2017

---

[5] Rules regarding the evaluation of medical opinion evidence were updated in 2017, but the updates were made effective only for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844 (Jan. 18, 2017). As Plaintiff's claim was filed in 2015, the Court evaluates the medical opinion evidence in his case under the older framework as set forth in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) and in Social Security Ruling 96-2p, 1996 SSR LEXIS 9.

United States District Court<br>Northern District of California

functional assessment, she diagnosed Plaintiff with rheumatoid arthritis and osteoarthritis. But a diagnosis associated with a listed impairment is not by itself sufficient to meet the criteria of a listing. *See Young v. Sullivan*, 911 F.2d 180, 181, 183-85 (9th Cir. 1990) ("While the [Listings do] describe conditions that are generally considered severe enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment.") (citing 20 C.F.R. § 404.1525(d) ("Can your impairment(s) meet a listing based only on a diagnosis? No. Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing.")). Moreover, although the ALJ considers opinions from medical sources on issues such as whether impairments meet or equal the requirements of any listing, the final responsibility for deciding the issue is left for the ALJ. 20 C.F.R. § 404.1527(d)(2), (3). So, Dr. Ferguson's diagnosis is not determinative.

Plaintiff also points out that Dr. Ferguson noted significant inflammation in Plaintiff's wrists, hands, and shoulders, and that Plaintiff's wrists were restricted. "[L]ike the opinion of a treating doctor, the opinion of an examining doctor can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (citations omitted). The ALJ reviewed Dr. Ferguson's assessment (and Dr. Khan's similar assessment) but gave little weight to her assessment of the extent to which Plaintiff's impairments affected her postural activities and gross and fine manipulation. AR 30. He felt those restrictions were inconsistent with Plaintiff's "conservative treatment modalities, [and] her limited examination findings which consist[ed] generally of tenderness in her hands," and he found that Dr. Ferguson (and Dr. Khan) had provided "little explanation for [those] extreme postural, standing/walking, and manipulative restrictions." AR 30. In particular, the ALJ noted that radiology reports from Dr. Mun (May 2, 2013) and Dr. Sani (Dec. 21, 2015 and Dec. 22, 2014) reported only mild soft tissue swelling around the bilateral wrists and PIP joints, and mild degeneration in the PIP and DIP joints. AR 31; *see* AR 517, 600, 605. The ALJ also noted

Dr. Ferguson's July 24, 2016 assessment that imaging and a physical examination had demonstrated "no joint inflammation as well as normal inflammatory markers." AR 31, 500. After reviewing x-rays, evaluating Plaintiff, and reviewing and agreeing with Dr. Ferguson's assessment, Dr. Mun "treated [Plaintiff] conservatively with extra strength Tylenol." AR 31, 500.

The ALJ also found that objective evaluations, "while demonstrating tenderness to palpation, also showed full muscle strength in upper and lower extremities, and intact sensation." AR 31. Dr. Kiefer's November 11, 2014 findings are consistent with that finding. He found only mild, diffuse tenderness at Plaintiff's bilateral hand joints, wrist joints, elbows, and shoulders, and a full range of motion at all joints and no localized tenderness. AR 331. Dr. Neuwelt's August 26, 2014 assessment is also consistent. It noted "bilateral mild soft tissue swelling" of Plaintiff's PIPs with minimal tenderness to palpation in those joints, and mild tenderness to palpation of her MCP joints and bilateral wrists with some associated soft tissue swelling, but "[o]therwise, no tenderness of her bilateral elbows or shoulders. . . . Strength is full in all extremities." AR 435. The assessment also noted a full range of motion of fingers, "full range to wrist extension with decreased [] range of motion to wrist flexion," and "[n]o obvious effusion or soft tissue swelling." *Id.* And it concluded, "negative CRP, rheumatoid factor and anti-CCP less suggestive of true rheumatoid arthritis." *Id.* And Dr. McMillan on June 25, 2015 noted that Plaintiff had normal DIP, PIP, and MCP joints, no wrist tenderness or shoulder tenderness, and normal range of motions in her wrists, elbows, shoulders, hips, knees, and ankles, and full-strength wrist, elbow, shoulder, hip, knee, and ankle flexion and extension. AR 350-51.

Plaintiff argues that Dr. Ferguson's medical opinion is supported by treating appointments showing persistent inflammation and deformity. She cites to a range of pages in the record, AR 488-520 and 606-610, but points to no particular portion from any medical record which would support Dr. Ferguson's assessment that she suffered from extreme postural, mobility, and manipulative restrictions. She also cites Dr. Gibbs' July 18, 2017 EEG/EMG Report, which diagnosed "right median sensory motor neuropathy at the wrist (carpel tunnel) severe," and "left . . . . moderate." AR 488. The ALJ considered that report, but noted the lack of any subsequent treatment notes, only conservative treatment modalities (hand braces) before it, lack of consistent

follow-up throughout the record, and "limited objective findings." AR 30. The ALJ identified "large treatment gaps in the claimant's record" which he found were inconsistent with her allegations of debilitating impairments," AR 30 (citing AR 521-605), and "evidence of noncompliance with treatment recommendations," AR 30. The record supports the ALJ's findings. For example, Dr. Neuwelt's August 26, 2014 assessment indicated that Plaintiff was last seen in the rheumatology clinic in late April 2014, and was then prescribed Norco (an opioid pain reliever) and prednisone (a corticosteroid anti-inflammatory), but that she did not fill her prescription for prednisone and had been taking Norco only for symptomatic relief. AR 434. Dr. Neuwelt also noted that Plaintiff had been taking an opioid pain reliever which she obtained from friends. Id. His May 5, 2015 assessment indicated that Plaintiff was "very noncompliant with medications and is requesting Norco refill and a prescription of Valium. We will refill Norco, however, patient needs to work on establishing primary care, and we will not get Valium, but trazodone for her sleep. The patient is to work on setting a primary care . . . ." AR 411. A March 30, 2016 chart note by Dr. Matthew Fentress, MD indicated that Plaintiff "ran out of methotrexate[6] – can't remember when," AR 583, and that while she continued to take Norco, she was only taking the methotrexate "on an 'as needed' basis, and ran out some time ago," AR 584. And Dr. Ferguson's April 17, 2017 assessment indicated that "[o]n prior exams . . . [Plaintiff] was treated with methotrexate, though it is unclear what effect [it] had as it was [a] somewhat long period of time between when it was started and when she was followed up in clinic again." AR 490. (Dr. Ferguson also noted that Plaintiff had had no new labs done since 2015, AR 491, and that she strongly felt she did not have carpal tunnel syndrome, AR 492.).

Furthermore, although Dr. Ferguson's August 15, 2017 functional assessment found significant inflammation in Plaintiff's wrists, hands, and shoulders, her April 17, 2017 assessment was that there was no evidence of membrane inflammation in Plaintiff's PIP joints, no tenderness

---

[6] Methotrexate is an "effective and widely used medication[] for treating inflammatory types of arthritis," and is believed to "slow[] the progression of [rheumatoid arthritis] and relieves symptoms by causing cells to release a molecule called adenosine, which blocks other chemicals that promote inflammation . . . ." Methotrexate: Managing Side Effects, *Arthritis Foundation*, https://arthritis.org/health-wellness/treatment/treatment-plan/disease-management/methotrexate-managing-side-effects (last visited Mar. 21, 2020).

to palpation in her DIP joints, normal extension in her wrists, and nondistended shoulders with normal abduction and internal and external rotation, and that Plaintiff was serologically negative with only subtle inflammation in the PIPs and DIPs.  AR 491-92.  And aside from Dr. Ferguson's assessment, Plaintiff points to no other medical evidence which would support her findings of an extreme loss of function in either upper extremity.  She cites Dr. Mun's May 17, 2017 radiology report, wherein Dr. Mun noted "periarticular osteopenia and soft tissue swelling of inflammatory arthritis.  Erosions are seen in the left third PIP joint."  AR 489.  But those findings are consistent with the ALJ's conclusion that while Plaintiff had arthritis, the record did not support the extreme limitations outlined in Dr. Ferguson's assessment.

The ALJ provided specific and legitimate reasons for finding that Plaintiff's physical impairments did not meet or medically equal a 14.09 listing, and substantial evidence supports that finding.  Thus, it is upheld.

### 2.    The ALJ's Evaluation of Listings 12.03, 12.04, and 12.06

Plaintiff contends that she met the following listings for mental disorders: 12.03, *schizophrenia spectrum and other psychotic disorders*, 12.04, *depressive, bipolar and related disorders*, 12.05, *intellectual disorder*, and 12.06, *anxiety and obsessive-compulsive disorders*.  Her argument relates to paragraph B of those listings.  Listings 12.03, 12.04, and 12.06 have three paragraphs, designated A, B, and C, and a claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C.  Listings § 12.00(A)(2).  In every mental impairment listing except 12.05, paragraph B provides the functional criteria an ALJ assesses to evaluate how an impairment limits a claimant's functioning.  *Id.* § 12.00(A)(2)(b).  The criteria, which represent the areas of mental functioning a person uses in a work setting, are: [1] understand, remember, or apply information; [2] interact with others; [3] concentrate, persist, or maintain pace; and [4] adapt or manage oneself.  *Id.*  To satisfy the paragraph B criteria, a claimant's mental impairment must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.  *Id.*; 20 C.F.R. § 404.1520a(c)(3).  An extreme limitation is an inability to function independently, appropriately, effectively, and on a sustained basis, and a marked limitation is a seriously limited

ability to function independently, appropriately, effectively, and on a sustained basis. Listings §

12.00(F)(2)(d)-(e). The ALJ found that Plaintiff had only moderate or mild limitations in each of

the four areas of mental functioning. AR 22. He found that if Plaintiff stopped substance use, she

would have only moderate limitations in understanding, remembering, or applying information,

concentrating, persisting, or maintaining pace, and adapting or managing herself; and only mild

limitation in interacting with others. AR 26. Plaintiff argues that the ALJ erred in finding she did

not have extreme or marked limitations in any of the four areas of mental functioning.

### a.      Understanding, Remembering, or Applying Information

Concerning Plaintiff's understanding, remembering, and applying information, Plaintiff

makes no substantive argument, and instead merely re-states the various findings of healthcare

providers that she suffered from marked or extreme limitations in this area of functioning. The

ALJ gave little weight to each of those opinions. The Court turns to each one in turn.

### i.      Dr. Aames' Opinion

Dr. Aames' August 15, 2017 mental impairment questionnaire noted an overall marked

impairment in Plaintiff's ability to understand, remember, and apply information, interact with

others, and adapt and manage herself; and an extreme impairment in her ability to concentrate,

persist, or maintain pace. AR 613-14. The ALJ considered Dr. Aames' assessment but found it

overly restrictive and gave it little weight. He found it failed to rely on objective testing and

evaluation, and relied too much on Dr. Aames' "routine psychotherapy sessions centered on the

claimant's life stressors." AR 31. Moreover, the ALJ found the assessment failed to account for

Plaintiff's "persistent noncompliance with treatment," including with substance abuse, "and her

ability to maintain living in her own with limited assistance." AR 31. The ALJ noted that

Plaintiff had received psychotherapy from Dr. Aames from February to July 2017. *See* 521-39.

He found that Dr. Aames' notes showed that many of Plaintiff's symptoms appeared to be stress

or grief-related. AR 28. The record is consistent with that finding. *See, e.g.*, AR 521, 535-36.

Regarding Plaintiff's noncompliance with treatment, the ALJ noted that on July 13, 2017,

after Plaintiff asked Dr. Aames about refilling prescriptions for Risperidone and Fluoxetine (two

psychotropic medications), Dr. Aames inquired about doing so only to learn they had not been

22

filled since April 2016. AR 523, 525. The ALJ referenced two other occasions in which a treatment provider raised the issue of Plaintiff's failure to follow prescribed treatment. AR 28. On August 4, 2015 Dr. Wu noted that Plaintiff requested a prescription of Xanax, "and at first stated that the Prozac I prescribed at her last visit didn't work – but on further questioning, I doubt she actually took the medication at all." AR 554. Dr. Wu noted that Plaintiff asked for valium if she could not be given Xanax, and that she spent the rest of the appointment explaining why she does not prescribe Xanax for anxiety. She also noted that Plaintiff "was on Risperdal, tried 2mg, disliked, [then] [s]topped med." AR 555. On May 5, 2016, Dr. Jeffrey Seal, MD, noted that Plaintiff "[didn't] want to take the mediation I prescribed (Zoloft)[,] pulls 2 bottles of it out and says she was previously given the same thing and doesn't like it." AR 542. He noted that Plaintiff told him, "I don't want these medications, Xanax works for me." AR 542. He noted that he revisited a conversation he had with Plaintiff from the prior visit about the need to try medication on a regular basis and that Plaintiff had been taking it only as needed. AR 542. Plaintiff complained to Dr. Seal that she was stressed because "she 'shouldn't have to see psychiatrists' to get disability money after having worked for 35 years." AR 542. Returning to Dr. Aames' chart notes, on July 28, 2017 (about two weeks before he completed his questionnaire) he noted that Plaintiff was not at that time taking any prescribed anti-depressants or other psychotropic drugs. *See* AR 521, 523. Hence, the record does support the ALJ's finding of persistent noncompliance with treatment, and Dr. Aames' assessment evidently failed to take into account noncompliance. Noncompliance with prescribed treatment is a significant consideration in the determination of disability status. 20 C.F.R. 404.1530 ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits."). Lastly, it's not clear that Dr. Aames factored any objective testing or evaluation into his assessment, and Plaintiff has not pointed to anything showing he did.

The ALJ provided sufficient reason for giving little weight to Dr. Aames' assessment and those reasons are supported by substantial evidence in the record.

### ii. Dr. Sakhai and LMFT Neumann's Opinion

Plaintiff also relies on Dr. Sakhai and LMFT Neumann's Mental Impairment

23

Questionnaire, in which they noted marked or extreme impairments in Plaintiff's understanding and memory; social interaction; adaptation; and activities of daily living; and extreme limitations in all categories of Plaintiff's sustained concentration and persistence. AR 473-75. The ALJ considered this assessment but gave it little weight because he found it was inconsistent with the evidence in the record. AR 28. In particular, he noted that Plaintiff began therapy with LMFT Neumann in late October 2016 and saw her for 10 visits from then to March 17, 2017. AR 28, 487-77. He noted that the visits were "routine therapy sessions" and that there was "little change in Ms. Neumann's observations, which generally consisted of notes regarding the claimant's fatigue and sleepiness due to hyper-vigilance and staying up all night, her grief, and difficult relationship with her family." AR 28. He noted that treatment notes documented no objective mental status evaluations but rather assertions of the same, repeated observations. *Id.* He noted that Dr. Sakhai did not conduct mental status testing to assess Plaintiff's mental functioning. He also felt that Dr. Sakhai's assessment was not consistent with Plaintiff's ability to live independently with limited support services. AR 28-29.

The record supports the ALJ's conclusions. As he found, Neumann's treatment notes often focused on Plaintiff's grief and difficult relationship with her family. *See, e.g.*, AR 486, 485, 484, 483, 482, 480 (ordered chronologically). While notes indicated that Plaintiff was suffering from paranoid schizophrenia or depression, they discussed no functional or behavioral limitations other than Plaintiff frequently feeling sleepy because of hypervigilance and staying awake at night. *See, e.g.*, AR 486, 482, 481, 478, 477. Only twice did the notes mention that Plaintiff had difficulty responding to questions, and both times the difficulty was associated with her feeling sleepy. AR 478 ("Client seemed extremely sleepy and had difficult responding to therapist's questions."), 477 ("Tried to engage with client and ask her about her extremely drowsy state."). Those limited observations are not consistent with Dr. Sakhai and Neumann's finding that Plaintiff was "barely able to have a conversation, is often in a catatonic state." AR 471. Also, most of the stated treatment goals, which remained largely consistent across treatment, don't strike the Court as consistent with the type of treatment necessary for a patient with extreme impairments in mental functioning. *See, e.g.*, AR 486, 485, 482 (working with Plaintiff to build rapport and address her

symptoms of hypervigilance and paranoia); AR 484, 483, 481 (teaching Plaintiff coping skills to help her calm herself); AR 480 (working with Plaintiff to process grief and the associated insomnia and depression); AR 479 (working on strategies for decreasing anxiety); AR 478 (working to develop capacity to express thoughts and feelings in therapy rather than retreating into herself). Lastly, neither the therapy notes nor the questionnaire mentioned objective testing or any other foundation for Dr. Sakhai and Neumann's assessment of such extreme limitations. And the questionnaire also indicated that Plaintiff last abused drugs or alcohol in 2010, even though Plaintiff admitted to substance abuse as late as June 2015. *See* AR 349. This suggests either that Dr. Sakhai and Neumann were not aware of Plaintiff's drug use or they did not account for the potential effects of substance abuse.

Relevant evidence supports the ALJ's decision to discount Dr. Sakhai and Neumman's assessment. The decision was not in error.

### iii.     Dr. Howard's Opinion

Dr. Howard's May 15, 2015 Medical Source Statement assessed Plaintiff with moderate to marked impairment in ability to understand, remember, and carry out instructions; and marked impairment in ability to interact appropriately with supervision, co-workers, and the public; in her pace, persistence of tasks, and ability to perform activities within a schedule and maintain regular attendance; and to respond to changes in routine work settings. AR 467-69. After a WAIS test, he reported a composite IQ score of 59, "extremely low." AR 465. He diagnosed Plaintiff with a GAF score of 54-56, AR 466, which indicates moderate difficulty in social and occupational functioning.

The ALJ considered Dr. Howard's assessment, but again gave the assessment little weight. AR 29-30. He found Dr. Howard's assessment of marked social interaction limitations was inconsistent with his objective observations, after a mental status exam, that Plaintiff was cooperative and compliant, and responded to questions adequately. AR 464. The ALJ noted that although claimant appeared moderately to markedly depressed and anxious during the exam, and self-reported sleep disturbance, social isolation, memory and concentration difficulty, she was nevertheless alert, coherent and oriented. AR 464-65. She responded to questions adequately.

United States District Court
Northern District of California

AR 463, 464. The ALJ also noted the absence of any mention of Plaintiff responding to internal stimuli. *See* AR 464-65. Additionally, Dr. Howard noted that "claimant appeared to comprehend the directions of the tests administered, and was able to respond to . . . tasks of the evaluation." AR 463. He noted that the normative samples of the tests administered were appropriate for Plaintiff's education level and acculturation level. *Id.* Plaintiff reported never having been psychiatrically hospitalized and that she was not then taking any medications. AR 464. Plaintiff's hygiene and grooming appeared adequate, and she had no abnormal tics, tremors, or mannerisms. *Id.* Her eye contact appeared adequate, and she was alert and oriented to person, place, time, and purpose of the evaluation, though she was unable to name the clinic she was in. *Id.* She was adequately cooperative and compliant with the evaluation and required only mild encouragement, though Dr. Howard noted that she became easily discouraged. *Id.* She presented "at least average language comprehension," as indicated by an ability to follow test instructions without the necessity of repetitions. *Id.* Her insight appeared fair and her judgment appeared good. AR 465. "[D]espite her reported hallucinations and fear that people break into her house if she leaves, she demonstrated no overt evidence of psychotic thought process." AR 466.

Accordingly, the record supports the ALJ's reasons for giving little weight to Dr. Howard's assessment of marked impairment in areas of mental functioning. While Dr. Howard's assessment did include objective testing that suggested significant impairment in Plaintiff's ability to function, Dr. Howard's own objective observations amounted to substantial evidence contradicting those findings, and the ALJ was within his discretion to give more weight to those observations. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) ("The ALJ is [] responsible for resolving ambiguities."); *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985) ("Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."); *Cha Thao Moua v. Comm'r of Soc. Sec.*, 2018 WL 5848889, at *2 (E.D. Cal. Nov. 6, 2018) ("The ALJ properly summarized the findings of the doctors, including observations and tests not consistent with their conclusions, and provided specific and legitimate reasons for assigning the weight he did."); *White v. Colvin*, 2016 U.S. Dist. LEXIS 135723, at *42-45 (D. Ariz. Sept. 29, 2016) (ALJ properly gave doctors opinions little weight because the opinions were

vague and imprecise and inconsistent with his own observation).

####     iv.     Dr. Franklin and Assessor Childs' Opinion

Dr. Franklin and Childs' January 1, 2015 psychological evaluation and report assessed Plaintiff with marked limitation in ability to understand, remember, and carry out simple or detailed instructions; interact appropriately with members of the public; accept instructions; and respond appropriately to criticism from supervisors; and extreme limitations in ability to maintain attention and concentration over two-hour segments; perform at a consistent pace without an unreasonable number and length of rest periods; get along and work with others; respond appropriately to changes in a routine work setting and deal with normal work stressors; and complete a normal workday and workweek without interruptions from psychologically-based symptoms. AR 462. They reported a composite IQ for Plaintiff of 61, "extremely low." *Id.*

The ALJ considered this report as well but gave it little weight. AR 29. As a main reason, he noted that Dr. Franklin and Childs found that it was "clear" that Plaintiff's impairments were not caused by substance abuse, even though Plaintiff stated at the evaluation that she drinks, smokes, and uses cocaine. AR 456, 462. Plaintiff also stated that substances "get her motivated to take care of things" and that her cocaine use had at one point been daily but at that time was two times per week at home by herself. AR 456. The report also noted that records had indicated "a history of substance related issues," and a number of medical issues including "multiple attempts at . . . psychotropic and pain medication prescriptions . . . ." *Id.* Plaintiff reported that she "takes lots of pain medication." *Id.* The report didn't indicate which medications, despite a documented history of substance use issues, and medical records—apparently reviewed by Dr. Franklin and Childs—which showed that Plaintiff had previously admitted to self-medicating with alcohol and cocaine. *See* AR 321, 455. Accordingly, the ALJ found that the assessment failed to consider the impact of Plaintiff's substance use on her mental and cognitive functioning, and that this reduced the probative value of their report and reliability of their assessment. AR 29. He also found their conclusion contradicted their own recommendation that she pursue regular psychotherapy to allow her to stop "self-medicating."

The ALJ offered a specific and legitimate reason for giving little weight to Dr. Franklin

27

and Childs' opinion, and the reason is supported by substantial evidence. *See Cothrell v. Berryhill*, 742 Fed. Appx. 232, 236 (9th Cir. 2018) ("The ALJ did not err in failing to consider the testimony of [the] examining psychologist. Like the ALJ, [she] found that [claimant] was disabled . . . . [She], did not, however, discuss the effect of [claimant's substance use on her disability determination despite acknowledging [claimant's] history of substance use. . . . This is a specific and legitimate reason to reject Dr. Causeya's opinion on this point.") (citation and internal quotation marks omitted).

Aside from these four opinions, Plaintiff cites to no other evidence that would support a finding of a marked or extreme limitation in understanding, remembering, or applying information. The ALJ gave specific and legitimate reasons based on substantial evidence for discounting those opinions, and the record as a whole supports the ALJ's finding of only a moderate level of impairment in this area of mental functioning.

**b.      Interacting with Others**

In addressing the severity of her limitation in interacting with others, Plaintiff asserts that she is paranoid with persecutory delusions and intentionally isolates herself. In support of that assertion, she mostly cites random things she said to various treatment providers. *See* Pl.'s Mot. at 13. However, she cites no authority which suggests that a claimant's mere statements are substantial evidence, and the Court does not find these are. Other than her own statements, Plaintiff relies again on Dr. Howard's assessment that she suffered from marked impairment in this area. But for the reasons discussed above, the ALJ did not err in discounting Dr. Howard's opinion.

Plaintiff also asserts that she has been volatile and at times aggressive with providers. She cites two incidents. In one Dr. Aames noted that Plaintiff "evinced [an irritable] mood and would talk over" him when he tried to explain a misunderstanding with some potential financial assistance from the LifeLong Trust Health Center. AR 527. Plaintiff "stormed out" of Dr. Aames' office saying, "See, that's why I hate doctors. You don't want to help me." *Id.* In the other incident, Plaintiff told Dr. Aames she needed surgery for arthritis, but then quipped, "I'm not going to let them cut me . . . doctors have a license to kill." AR 522. Neither of those incidents

does much of anything to show that Plaintiff suffered from significant limitation in interacting with others (or even a moderate one).

The Court agrees with the ALJ's finding that Plaintiff "generally interacted adequately with treatment providers, and was able to seek care for herself and communicate her needs adequately." AR 26. The record supports his finding of only mild limitations in interacting with others.

### c.    Concentrating, Persisting, or Maintaining Pace

Regarding this area of functioning, the only evidence that Plaintiff points to are: Dr. Sakhai and LMFT Neumann's opinion that she was catatonic and "barely able to have a conversation," as well as their assessment that she suffered from extreme impairment in this area of functioning; Dr. Howard's opinion that she demonstrated marked impairment in this area; and Dr. Franklin's opinion that she suffered from extreme impairment to perform at a consistent pace. For the reasons discussed above, the ALJ did not err in discounting those opinions.

Plaintiff otherwise argues that "being able to drive, filling out paperwork . . . or testifying about herself in a disability hearing is not substantial evidence of mild impairments." Pl.'s Mot. 13. But at this step, it was Plaintiff's burden of proof to demonstrate disability, and she did not put forth substantial evidence of anything other than mild or moderate impairments.

Substantial evidence supports the ALJ's finding of only moderate limitation in concentrating, persisting, or maintaining pace.

### d.    Adapting or Managing Oneself

Here, the ALJ determined that a finding of a moderate limitation was supported by Plaintiff's testimony that she was able to live alone, albeit with limited help from an in-home support services aide. AR 26. He noted that Plaintiff is generally capable of taking care of her hygiene and grooming, as there was no evidence in the record that she required toileting or help with bathing or similar tasks. *Id.* He noted that she was able to manage her finances by paying bills and was able to go to the store to get things that she needed. *Id.*; *see* AR 343.

Plaintiff argues that she is not capable of caring for her herself or her own home. The record as a whole does not show that. Plaintiff points out that Dr. Aames noted "poor grooming"

29

in a March 2017 session and that a month earlier had noted that she was "poorly groomed and casually dressed in what appeared to be pajamas bottoms, layered shirts, and a knitted hat." AR 531, 535. Those observations don't get Plaintiff anywhere near the goalpost of proving a marked or extreme limitation in managing herself.

Plaintiff also points out that she has an in-home support services aid. The ALJ considered this fact in determining that Plaintiff had only moderate limitations in the four areas of mental functioning. AR 26. Plaintiff's need for limited assistance in living independently does not seriously limit her ability to function independently, appropriately, effectively. Substantial evidence supports the ALJ's finding of only moderate limitation in this area of functioning.

Because the ALJ did not err in finding that Plaintiff's impairments did not result in extreme or marked limitation of any of the four areas of mental function, he correctly found that the paragraph B criteria for 12.03, 12.04, or 12.06 were not satisfied. Thus, he correctly found that Plaintiff's impairments did not meet or medically equal 12.03, 12.04, or 12.06.

### 3. The ALJ's Evaluation of Listing 12.05

"Listing 12.05 explains that intellectual disability refers to *significantly subaverage general intellectual functioning* with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." *Kennedy v. Colvin, 738 F.3d 1172, 1175* (9th Cir. 2013) (citing § 12.05) (internal quotation marks omitted) (emphasis added). The ALJ found that listing 12.05 was not met because Plaintiff did not have significant deficits in adaptive functioning currently manifested by dependence upon others for personal needs such as toileting, eating, dressing, or bathing. AR 22. He found no records showing that Plaintiff had a disability prior to age 22, and that her inability to graduate from high school was alone insufficient evidence of that. *Id.* He accurately found that no evidence suggested that Plaintiff had significantly subaverage general intellectual functioning before the age of 22.

Plaintiff asserts that "extensive clinical interviewing from Dr. Franklin over multiple hours demonstrates that [her] problems with school started in her youth." Pl.'s Mot. at 15. However, that argument is not persuasive. Any problems that Dr. Franklin identified with Plaintiff's

schooling did not come to the surface through "extensive clinical interviewing . . . over multiple hours;" it seems instead that Plaintiff simply told Dr. Franklin on one occasion that "she got good grades but dropped out the second semester of 12th grade," and for reasons having nothing to do with her intellectual functioning at all. *See* AR 455. Further, Plaintiff reported several other times, including during her testimony before the ALJ, that she took some college or certification courses. *See* AR 41, 343, 349, 463. She also reported that she had good grades in school and denied having taken special education courses. AR 463. The record does not support Plaintiff's contention that she meets listing 12.05, and the ALJ did not err in finding so.

### 4. The ALJ's DAA Materiality Finding

If there is a determination that the claimant is disabled and there is medical evidence showing DAA, then the ALJ must determine whether the DAA is material to the finding that the claimant is disabled. 20 C.F.R. § 404.1535(a). The ALJ found Plaintiff's substance abuse was material.

Plaintiff argues the ALJ erred in proceeding with a materiality determination. As Plaintiff notes, under the SSA and regulations, an ALJ makes a DAA materiality determination when medical evidence from an acceptable medical source establishes that a claimant has a substance use disorder. 2013 SSR LEXIS 2, at *9-10. Plaintiff argues that materiality was not an issue from her alleged onset date, December 1, 2010.[7] That is not accurate. On September 8, 2014, Dr. Boroff indicated that Plaintiff had been self-medicating her physical and emotional pain with alcohol and occasional cocaine use, and he diagnosed her with moderate alcohol use disorder and mild cocaine use disorder. AR 321-22. On June 13, 2015, Dr. Gaasbeek diagnosed Plaintiff with stimulant use disorder, severe, cocaine in remission. AR 344. And a November 6, 2015 treatment

---

[7] Plaintiff's Title II and Title XVI applications alleged an onset date of December 1, 2010. Before the ALJ, Plaintiff attempted to amend her alleged onset date to February 28, 2015, the date she filed her applications. Because her date last insured was September 30, 2011, such an amendment would have amounted to a withdrawal of her Title II claim. The ALJ denied the motion to amend because he found it wasn't clear Plaintiff understood the amendment would have that consequence. In her opening brief before this Court, Plaintiff says she is appealing the denial of both her Title II and Title XVI applications, but in her reply she abandons her Title II claim. The apparent reason for abandoning the Title II claim is to cut off consideration of evidence, including evidence of substance abuse, from before February 2015. Regardless, there is also evidence of substance abuse after February 2015.

note by Dr. Ferguson noted a history of polysubstance abuse including marijuana and cocaine. AR 397.

Furthermore, the record is replete with other references of substance abuse. For example, Dr. Neuwelt indicated on August 26, 2014 that Plaintiff had been taking tramadol, an opioid painkiller, which she had gotten from friends, and had reported that she drank a pint and a half of vodka with a few beers on a nearly daily basis, that she occasionally smoked marijuana, and that she sometimes inhaled illicit substances. AR 434. He noted, "[w]e performed extensive counseling regarding her prior transaminitis likely caused by alcohol intake as well, with possible contribution of Norco abuse. Discussed the potential side effects of methotrexate-induced transaminitis and strongly advised to quit drinking alcohol as well as decreasing the amount of Norco that she uses." AR 436. On January 1, 2015, Dr. Franklin indicated that Plaintiff reported that she drinks when she smokes and uses cocaine sometimes, that "substances get her motivated to take care of things," and that her cocaine use was daily but "she now uses it 2 times per week at home by herself." AR 456. Dr. Franklin noted that records referenced an arrest with cocaine prior to 2015. *Id.* Dr. Wu indicated on March 10, 2015 that records indicated that Plaintiff was actively using cocaine in 2014. AR 558. On May 5, 2015, Dr. Neuwelt indicated that Plaintiff continued to drink one to two beers a day and used marijuana and was trying to quit cocaine but had used about 1 ½ to 2 weeks prior. AR 411. On June 25, 2015, Dr. McMillan noted that Plaintiff stated that she drinks alcohol every day and had used cocaine the day before. AR 349. Dr. Aames noted on February 9, 2017 that Plaintiff reported that she had in the past used both cocaine and alcohol to self-medicate. AR 538. Plaintiff reported last using substances about only a year prior. *Id.*

"[W]hen evidence exists of a claimant's drug or alcohol abuse," as it does here, in large quantity, "the claimant bears the burden of proving that his substance abuse is not a material contributing factor to his disability." *Parra v. Astrue*, 481 F.3d 742, 744-45 (9th Cir. 2007). Plaintiff really only points to Dr. Sakhai and LMFT Neumann's March 17, 2017 questionnaire, where they indicated that Plaintiff last abused drugs or alcohol in 2010. But as mentioned earlier, the ALJ gave little weight to this assessment. And Plaintiff admitted to substance abuse as late as June 2015, AR 349, which suggests that Dr. Sakhai and Neumann were not aware of Plaintiff's

drug use (or misreported it).

Plaintiff was not, as she asserts, honest about her alcohol and cocaine use. For example, Plaintiff reported to Dr. Gaasbeek on June 13, 2015 that she hadn't used cocaine for a "very long time," for close to 10 years. But she reported to Dr. Franklin on January 1, 2015 using it "2 times per week," and on May 5, 2015 she admitted to Dr. Neuwelt to having used cocaine 1 ½ to 2 weeks prior. And again on June 25, 2015, she admitted to Dr. McMillan to using cocaine the day before.

Finally, Plaintiff has not, as she asserts, put forth affirmative evidence of abstinence in the relevant period. The ALJ's decision to proceed with a materiality determination was not in error, and his finding of materiality was supported by substantial evidence in the record.

### 5. Plaintiff's Remaining Two Arguments

Plaintiff contends that the ALJ erred in finding that she had the RFC to perform light work with an ability to lift or carry 20 pounds occasionally and 10 pounds frequently. She points to Dr. Ferguson and Dr. Khan's assessments that she could lift and carry only less than 10 pounds. As explained above, however, the ALJ properly discounted those assessments as inconsistent with the record. Consequently, this argument fails.

Plaintiff also argues that the ALJ improperly ignored the Medical-Vocational Guidelines in finding that she would have the RFC to perform light work if she stopped substance use and thus would not be disabled. The Guidelines, however, are applicable at step five. *See Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007) ("To assist in the step-five determination, the Social Security Administration established the Medical-Vocational Guidelines (the grids), which . . . set forth rules that identify whether jobs requiring a specific combination of these factors exist in significant numbers in the national economy.") (citation and internal quotations omitted); *Tackett v. Apfel*, 180 F.3d 1094, 1100-01 (9th Cir. 1999) ("There are two ways for the Commissioner to meet the burden of showing that there is other work in 'significant numbers' in the national economy that claimant can perform: (a) by the testimony of a vocational expert, or (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.") (citation omitted). Here, the ALJ's determination that Plaintiff would be able to perform past relevant work

was made at step four.  The Guidelines were not applicable.

## VI.    CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion.  The Court shall enter a separate judgment, after which the Clerk of Court shall terminate the case.

**IT IS SO ORDERED.**

Dated: March 24, 2020

THOMAS S. HIXSON
United States Magistrate Judge